No. 97-664

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 4

STATE OF MONTANA,

Plaintiff and Respondent,

v.

ROY A. LINK,

Defendant and Appellant.

APPEAL FROM: District Court of the Tenth Judicial District,

In and for the County of Judith Basin,

The Honorable John Christensen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Craig R. Buehler, Attorney at Law, Lewistown, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General,

Joseph E. Thaggard, Ass't Attorney General, Helena, Montana

James A. Hubble, County Attorney, Stanford, Montana

Submitted on Briefs: October 22, 1998

Decided: January 21, 1999

Filed:

No

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. The State of Montana (the State) charged Defendant, Roy A. Link (Link), by amended information filed in the District Court of the Tenth Judicial District, County of Judith Basin, with Count 1 - Arson by Accountability, Count 2 - Deliberate Homicide by Accountability, and Count 3 - Deliberate Homicide. The charges arose from a mobile home fire that resulted in the death of Link's stepfather, Leonard Theis (Leonard). The State alleged that Link had acted in concert with his sister, Donna June Enright (Enright), and her boyfriend, John Kozlowitz (Kozlowitz), to intentionally start the fire so the parties could collect on a number of life insurance policies purchased on Leonard's life. Link pleaded not guilty to the charges. Following a trial by jury, Link was found guilty of Counts 1 and 3, but acquitted of Count 2. Link appeals his conviction and sentence. We reverse the judgment of the District Court, and remand for a new trial.**

**¶2. For purposes of this appeal, there are two dispositive issues:**

**¶3. (1.) Did the District Court abuse its discretion in admitting evidence of the 1995 Gore Hill fire as other crimes, wrongs, or acts pursuant to Rule 404(b), M.R.Evid.?**

**¶4. (2.) Was there sufficient evidence to support the jury's verdict?**

**Factual and Procedural Background**

**¶5. Early in the morning of October 17, 1996, Leonard died in a mobile home fire in Stanford. At the time of his death, Leonard was married to Faye Theis (Faye), who presently resides in a nursing home in Great Falls. Although the couple conceived no children during their marriage, Faye had four children from a previous marriage,**

including Link and Enright. For a number of years, Faye and Leonard lived in Great Falls, in a mobile home located on Gore Hill.

¶6. Leonard was a slightly mentally retarded adult who, at the time his of death, also suffered from the early stages of Alzheimer's disease or a related form of dementia. Although early in his life Leonard worked at the Anaconda Company in Great Falls long enough to qualify for a pension, he was incapable of work by 1988 and began to collect social security benefits. Leonard was briefly confined to a nursing home in 1993. Enright and Link obtained co-power of attorney over Leonard that same year. At that time, it was agreed among the family members that Enright would reside with Leonard in the mobile home on Gore Hill. In 1994, Enright also obtained guardianship over Leonard.

¶7. On February 16, 1995, Link signed a quitclaim deed on behalf of Faye,[1] and Enright signed that same deed on behalf of Leonard, transferring the couple's interest in their Gore Hill mobile home to Enright's boyfriend, Kozlowitz. Pursuant to this transfer, Kozlowitz became the named insured on the homeowner's insurance policy for the Gore Hill mobile home. A few days later, on February 22, 1995, the Gore Hill mobile home was badly damaged by fire (the Gore Hill fire). Neither Leonard nor anyone else was in the mobile home at the time of the fire. The Cascade County Sheriff's Department was unable to determine the cause of the blaze, and the fire was therefore classified as accidental. The insurer subsequently approved funds for debris removal at the fire site, and Link bid for and received the clean-up job on the Gore Hill fire. However, Link only oversaw the clean-up job; apparently, most of the insurance funds went to a man named Rex.

¶8. The insurance proceeds that Kozlowitz received from the Gore Hill fire were largely used to purchase the Sundown Inn, a bar and restaurant located in Stanford. In August of 1995, Leonard, Enright, and Kozlowitz moved from Great Falls to Stanford to pursue this business endeavor. The parties purchased three contiguous trailer lots; two trailers owned by Kozlowitz were kept on the lots, with Leonard and Enright residing in one, and Kozlowitz living in the other. By April of 1996, however, the business failed and the parties were forced to close the Sundown Inn.

¶9. In July of 1996, Enright purchased an insurance policy to cover the Stanford mobile home in which she and Leonard resided. From July to early October 1996, Enright also purchased a number of life insurance policies on Leonard's life. Enright

completed the applications for these policies and signed Leonard's signature to them in a way that made it appear that Leonard had actually completed the applications. Two of these policies named Enright as the beneficiary, and two of these policies named Link as the beneficiary. Enright testified at trial that, as of August 3, 1996, Link was aware that one of the insurance policies named him as the beneficiary that two of the policies named Enright as the beneficiary. However, the two insurance policies naming Link as the beneficiary were not issued until September 17 and 18, 1996.

¶10. On August 1, 1996, shortly before his death, the Anaconda Company paid Leonard two lump sum distributions of his pension benefits, totaling over $30,000 after taxes. Enright, as Leonard's legal guardian, obtained control over these funds and purportedly used the money to pay bills. On September 3, 1996, due to the business failure of the Sundown Inn, Enright and Leonard decided to move back to Great Falls. Over the course of the next six weeks, Link helped Enright and Leonard move various belongings from the Stanford mobile home to a house that Enright owned in Great Falls.

¶11. On October 16, 1996, Link and his wife went to the Stanford mobile home to pick up Leonard's favorite recliner chair. Link and his wife then went to Jim's Water Hole, a Stanford bar, where they knew they would find Enright. While inside the bar, Link and Enright spoke privately with each other for approximately fifteen minutes. The precise nature of this communication is unknown. Apparently, at some point during this conversation, Enright instructed Link to give Leonard some Tylenol with codeine; however, it is unclear whether Link ever did so. Following this conversation, Link and his wife returned to their own home in the Great Falls area, where they remained for the rest of October 16, 1996.

¶12. After gambling at Jim's Water Hole until 9:30 p.m. on October 16, 1996, Enright and Leonard returned to the Stanford mobile home to do some laundry and spend the night. At 3:40 a.m. on October 17, 1996, Enright called 911 to report that the mobile home was on fire. An undersheriff who resided nearby was the first to arrive at the fire scene, at which time he observed Enright and Kozlowitz standing casually outside the burning mobile home. Enright then mentioned that Leonard was still in his bedroom.

¶13. At 3:51 a.m., Enright called Link from Kozlowitz's telephone to inform him that

the Stanford mobile home was burning. During this conversation, Enright apparently informed Link that Leonard had died in the fire. However, at about this same time, emergency personnel were just arriving at the fire scene and Leonard's body had not yet been recovered from the mobile home. Following this phone call, Link and his wife immediately drove up to Stanford. Later that day, Link went to a mortuary in Great Falls to make arrangements for the cremation of Leonard's body.

¶14. Fire officials located Leonard's body, coated with soot, on a couch in the living room of the mobile home. An autopsy indicated that he died--without any indication of struggle--from carbon monoxide poisoning due to smoke inhalation. The doctor who performed the autopsy discovered an abnormally large amount of soot in Leonard's trachea, which was unusual because a person would normally wake up and "cough a great deal" when exposed to a substantial amount of smoke. The doctor noted, however, that a person in a sedated state might not wake up under such circumstances. A subsequent toxicology report on Leonard's blood revealed that he had consumed a "therapeutic amount" of Diphenhydramine (known commercially as Benadryl), an antihistamine that can have a sedative effect on certain individuals, and also had traces of Acetaminophen, an analgesic, in his blood-stream. Another toxicology report of a urine stain found on Leonard's jeans also revealed the presence of Benadryl, as well as codeine, a narcotic drug with a sedative effect.

¶15. Fire officials questioned Enright at the scene of the fire, and became suspicious of many inconsistencies in her story. Two separate investigations concluded that the fire had originated roughly two feet off the floor in the unoccupied, middle bedroom of the mobile home. Initially, neither investigation could determine the precise cause of the fire. Investigators did recover some "beaded" wire from the middle bedroom, which suggested that the wire might have melted due to an electrical short. After further investigation, however, fire officials were able to rule out all possible natural or accidental causes of the fire. They determined that the fuel source for the fire consisted of wadded newspapers contained in cardboard boxes located in the middle bedroom, which had been intentionally lit; and that the fire was "incendiary in nature," suggesting an act of arson. Similarly, insurance officials who investigated the fire concluded that the cause of the fire was arson. Insurance officials also noted that it was significant that Enright had failed to initially acknowledge that Link had removed Leonard's chair from the Stanford mobile home the day before the fire, since the removal of property from a residence immediately prior to a fire can

suggest a motive for arson.

¶16. On November 4, 1996, Link made a claim on a life insurance policy that named Enright's son as the beneficiary. A police investigator interviewed Enright on November 6, 1996, but she denied that any life insurance policies existed for Leonard. The following day, police obtained a search warrant and searched Enright's Great Falls residence. They recovered six active life insurance policies for Leonard, instructional manuals for smoke detectors, a box containing wadded newspapers similar to those recovered at the fire scene, and numerous items of property that Enright had told her insurer were destroyed in the Stanford fire. Enright refused to submit to another police interview.

¶17. Enright was arrested and charged with deliberate homicide and arson on November 13, 1996. Police then obtained a search warrant and, on November 26, 1996, searched Link's residence. They recovered a letter from Enright to Link, postmarked November 22, 1996, which stated in relevant part:

So I can kick back and sit it out if it sounds good to the team--check with Tom [Martin, Enright's son,] and John [Kozlowitz, Enright's boyfriend] . . . .

. . . .

I told [my attorney] I was so worried about [the State] trying to charge you guys with a conspiracy. He said for me not to worry. The only way that would happen is if one of you implicated yourself or me--I don't see how any of you could or would do that. So that's one less thing to worry about . . . .

¶18. Sometime during February, Link made claims on various life insurance policies that named either Enright or Link as beneficiaries. The State filed charges against Link on March 11, 1997. Prior to trial, the State gave the required notice of its intention to introduce "evidence of other crimes"--seven previous fires that occurred on property associated with Enright since 1965, including the 1995 Gore Hill fire. The District Court excluded evidence of every prior fire except the Gore Hill fire. However, as a precondition to admittance of evidence of the Gore Hill fire, the court required the State to connect Link to the 1995 fire. Evidence of the Gore Hill fire was subsequently admitted into evidence. Link appeals.

## Discussion

¶19. **(1.) Did the District Court abuse its discretion in admitting evidence of the 1995 Gore Hill fire as other crimes, wrongs, or acts pursuant to Rule 404(b), M.R.Evid.?**

¶20. **Rule 404(b), M.R.Evid., governs the introduction of "other crimes, wrongs or acts" evidence (other acts evidence).** *See* **Rule 404(b), M.R.Evid. We review a district court's ruling on evidentiary matters, including issues that implicate Rule 404(b), M.R.Evid., for an abuse of discretion. State v. Brogan (1995), 272 Mont. 156, 164, 900 P.2d 284, 289; State v. Romero (1993), 261 Mont. 221, 224, 861 P.2d 929, 931. Trial courts are vested with broad discretion to determine whether evidence is relevant and admissible, and this Court will not overturn a district court's evidentiary determination in the absence of an abuse of this discretion. State v. Anderson (1996), 275 Mont. 344, 347, 912 P.2d 801, 803.**

¶21. **Link asserts that the District Court abused its discretion in admitting the Gore Hill fire as other acts evidence because there was "no evidence" that either he or Enright caused that fire, intentionally or unintentionally. Thus, since there was no proof that an "other crime, wrong, or act" was actually committed, Link argues that the Gore Hill fire cannot properly be considered other acts evidence pursuant to Rule 404(b), M.R.Evid. The State responds that this Court has never required a threshold finding of the sufficiency of other acts evidence as a predicate to its admissibility, and that evidence of the Gore Hill fire was therefore properly admitted under the standard of Rule 404(b), M.R.Evid., as defined by this Court in the so-called "Modified Just Rule."** *See generally* **State v. Just (1979), 184 Mont. 262, 602 P.2d 957,** *modified by* **State v. Matt (1991), 249 Mont. 136, 814 P.2d 52.**

¶22. **The State is correct in pointing out that the Modified Just Rule does not require a threshold sufficiency of the evidence determination before other acts evidence may be admitted.** *See* **State v. Paulson (1991), 250 Mont. 32, 817 P.2d 1137 (declining to incorporate a threshold sufficiency of the evidence determination for other acts evidence). However, in the companion case to this appeal, State v. Enright, 1998 MT 322, ___ P.2d ___, 55 St.Rep. 1308, in which Enright challenged the admittance of the Gore Hill fire at her trial, this Court concluded that the four-part analysis required under the Modified Just Rule to determine the admissibility of other acts evidence "assumes that there is evidence of a prior crime, wrong, or act, and without such evidence, there is nothing to analyze."** *Enright***, ¶ 24. We hold that the District Court**

abused its discretion in admitting the Gore Hill fire as other acts evidence because, as in *Enright*, there was no evidence that Link ever committed a prior, wrongful act with regard to the Gore Hill fire.

¶23. Link relies principally upon State v. Johnson (1991), 250 Mont. 496, 821 P.2d 1039. In *Johnson*, the defendants were charged with arson or, in the alternative, criminal mischief in connection with a fire that destroyed a mobile home. *Johnson*, 250 Mont. at 497, 821 P.2d at 1040. The trial court in *Johnson* permitted the State to introduce other acts evidence of six prior fires that had occurred under suspicious circumstances on premises that were owned or occupied by one or both of the defendants. *Johnson*, 250 Mont. at 497-98, 821 P.2d at 1040. Following the introduction of this other acts evidence, the defendants were found guilty of criminal mischief by the jury. *Johnson*, 250 Mont. at 498, 821 P.2d at 1040. The defendants appealed to this Court, arguing that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice because the defendants were never charged with any wrongdoing regarding these fires, nor did any evidence exist in the record that proved that the defendants had intentionally caused them. *Johnson*, 250 Mont. at 498, 821 P.2d at 1041. In *Johnson*, we held that

the admittance of these prior fires unfairly prejudiced the Defendants as <u>no evidence exists that links Defendants with intentionally causing these prior fires. Therefore, these fires cannot be considered other crimes, wrongs or acts under Montana Rules of Evidence 403 and 404(b)</u>. [Emphasis added.]

*Johnson, 250 Mont. at 499, 821 P.2d at 1041.*

¶24. Thus, under nearly identical factual circumstances to this case, this Court in *Johnson* declined to engage in the four-part other acts analysis of the Modified Just Rule because, as here, there was "no evidence" that the defendants had actually committed a prior, wrongful act. We conclude, as we did in *Enright*, "that an analysis pursuant to Rule 404(b), M.R.Evid., of 'other crimes, wrongs or acts' evidence assumes that there is evidence of a prior wrongful act. In this case, there was none." *Enright*, ¶ 28.[(2)]

¶25. The Gore Hill fire was the subject of an official investigation by Tom O'Hare of the Cascade County Sheriff's Department. At trial, O'Hare testified that Enright had made comments to him suggesting that a careless smoker may have inadvertently caused the fire. Although O'Hare was able to determine that the fire had originated on a bed, he found no evidence of foul play and, accordingly, the cause of the Gore Hill fire was determined to be "accidental." This official conclusion remained unaltered even though Link's brother, Larry Link, subsequently filed a statement with the sheriff's department that he thought the Gore Hill fire was caused by arson. Moreover, in conjunction with the official investigation, the claims adjuster for the insurer of the Gore Hill mobile home also investigated the fire and determined that there was no evidence of arson. Nor did the State introduce any new or additional evidence at trial showing that the Gore Hill fire was other than accidental. As in *Enright*, there was "insufficient foundation" to offer the Gore Hill fire as a prior crime or wrongful act of either Enright or Link and, therefore, there is simply "no basis" for analyzing the accidental occurrence of the Gore Hill fire pursuant to the Modified Just Rule. *See Enright*, ¶ 28.

¶26. According to the State, Link's involvement in "suspicious, critical events" surrounding the Gore Hill fire--his participation in the transfer of title prior to the fire and his compensation by the insurance company for debris removal subsequent to the fire--sufficiently "tied Link to the Gore Hill fire" to support the State's contention that Link's "purpose or intent with regard to the commission of the [Stanford mobile home] fire may be inferred from his acts and circumstances surrounding the [Gore Hill] fire." While the State correctly points out that circumstantial evidence is an acceptable--indeed, often indispensable--means of proving criminal intent in Montana, *see* State v. Schaff, 1998 MT 104, ¶ 24, 958 P.2d 682, ¶ 24, 55 St.Rep. 396, ¶ 24, we do not agree that Link's involvement in suspicious circumstances surrounding the Gore Hill fire offers a sufficient evidentiary basis upon which to logically infer Link's motive or intent to commit arson with respect to the Stanford mobile home.

¶27. Indeed, Link's activities surrounding the earlier, Gore Hill fire only take on a "suspicious" tenor by contextualizing those activities in terms of the later, Stanford mobile home fire. In other words, the State invited the jury to infer that something "criminal" was done by Link in 1995 based upon the charges at issue in this case, and then the State used that inference of prior criminality to bootstrap its way into a jury finding of Link's guilt for the Stanford mobile home fire. *See Enright*, ¶ 30.

However, this Court has long adhered to the notion that, "[u]nless evidence naturally and logically tends to establish a fact in issue, it is not admissible." Britton v. Farmers Ins. Group (1986), 221 Mont. 67, 86, 721 P.2d 303, 315.

¶28. Furthermore we question the relevance of the Gore Hill fire in proving the State's allegation that Link and Enright had engaged in a series of acts--including the 1995 Gore Hill fire--aimed at liquidating Leonard's assets and then killing him. Without any proof that either Link or Enright intentionally caused the prior fire, any evidence of the Gore Hill fire was not, therefore, relevant to the issue of whether Link and Enright had a common scheme or plan to start the Stanford mobile home fire. Thus, in admitting the evidence, the District Court unfairly prejudiced Link. " '[E]vidence which tends to . . . increase a desire to punish due to a prior act of a party and whose [sic] probative value is slight may be properly excluded' " as unfairly prejudicial. *Paulson*, 250 Mont. at 43, 817 P.2d at 1144, *quoting* 10 James William Moore, Moore's Federal Practice § 403.10.

¶29. If evidence has been improperly admitted, this Court will find reversible error based on prejudice to the defendant where there is a reasonable probability that the inadmissible evidence might have contributed to the conviction. State v. Berger, 1998 MT 170, ¶ 39, 964 P.2d 725, ¶ 39, 55 St.Rep. 686, ¶ 39. Without evidence of the Gore Hill fire, the jury may not have convicted Link. Indeed, in discussing the State's proof of Link's accountability for Enright's alleged acts of arson and homicide, the District Court even conceded at trial "that the case is not strong against" Link. We conclude that there is a substantial possibility that evidence of the Gore Hill fire increased the jury's desire to convict Link. Therefore, we reverse and remand to the District Court for a new trial.

¶30. (2.) Was there sufficient evidence to support the jury's verdict?

¶31. Having reversed on the other acts issue, it is still necessary to address Link's contention that there was not sufficient evidence to support the jury's verdict. We review the sufficiency of the evidence supporting a jury verdict to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Plenty Hawk (1997), 285 Mont. 183, 186, 948 P.2d 209, 210 (citing State v. Ross (1995), 269 Mont. 347, 360, 889 P.2d 161, 169).

¶32. The jury convicted Link of arson by accountability (Count 1) and deliberate homicide under the felony murder rule (Count 3). According to this verdict, we must assume that the jury believed the State's contentions that Link aided and abetted Enright's alleged commission of arson, resulting in the death of Leonard. Thus, to support the verdict, the State was required at trial to prove beyond a reasonable doubt that Enright had "knowingly or purposely" set the fire that caused Leonard's death, *see* § 45-6-103, MCA (arson), and that Link had acted with the "purpose to promote or facilitate" Enright's alleged act of arson, *see* § 45-2-302, MCA (accountability).

¶33. "The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense." Section 45-2-103(3), MCA. Furthermore, a conviction may be based solely upon circumstantial evidence. *See* State v. Bromgard (1993), 261 Mont. 291, 295, 862 P.2d 1140, 1142; State v. Brogan (1993), 261 Mont. 79, 89, 862 P.2d 19, 26. Circumstantial evidence need only be of sufficient quality and quantity to legally justify a jury in finding guilt beyond a reasonable doubt, taking into consideration all of the facts and circumstances surrounding the charged offense collectively. State v. Lancione, 1998 MT 84, ¶ 37, 288 Mont. 228, ¶ 37, 956 P.2d 1358, ¶ 37. Here, even after excluding evidence of the Gore Hill fire, there was still sufficient circumstantial evidence for the State's charges to be submitted to the jury.

¶34. During the three months prior to Leonard's death, Enright purchased six life insurance policies on Leonard's life. At trial, Enright testified that by August 3, 1996, Link knew that she had obtained numerous life insurance policies on Leonard's life, including at least one policy that named Link as the beneficiary. One day before the Stanford mobile home fire, Link removed a chair from the mobile home--an act which can suggest a motive for arson. That same day, Link and Enright engaged in a private conversation in Stanford, during which Enright allegedly asked Link to give Leonard some acetaminophen with codeine. The doctor who performed the autopsy on Leonard's body noted that he might have been sedated, and a subsequent toxicology report indicated the presence of certain sedative drugs in Leonard's blood-stream at the time of his death. During the fire, Enright called Link and, prior to the recovery of Leonard's body from the mobile home, told him that Leonard had died in the fire. After the fire, Link immediately arranged for the cremation of Leonard's body, and then later submitted claims on life insurance policies that named Enright, Enright's son, or Link as the beneficiary. There were numerous inconsistencies in

Enright's story concerning the Stanford mobile home fire that aroused official suspicion. Pursuant to a search warrant executed on Enright's residence prior to her arrest, police discovered six life insurance policies on Leonard's life that Enright had previously denied existed, some of which named Link as the beneficiary, as well as a box containing wadded newspapers similar to those recovered at the fire scene, and numerous items of property that Enright had told her insurer were destroyed in the fire. Following Enright's arrest, police then executed a search warrant on Link's residence and recovered a letter from Enright to Link, in which Enright spoke of a "team" consisting of herself, her son, Kozlowitz, and Link, and in which she cautioned Link not to implicate himself, lest he be charged with conspiracy. And finally, the State introduced expert opinion testimony that the Stanford mobile home fire was caused intentionally.

¶35. While the foregoing evidence may be susceptible of an interpretation supporting Link's innocence, it is the province of the trier of fact to judge the credibility of the evidence presented. Where the evidence is capable of differing interpretations, one supporting innocence and the other supporting guilt, the trier of fact determines which interpretation is the most reasonable. *See* State v. Neary (1997), 284 Mont. 409, 414, 944 P.2d 750, 754. We hold that the evidence introduced at Link's trial was sufficient to permit any rational trier of fact to find beyond a reasonable doubt that Link aided and abetted Enright's commission of arson with the purpose to facilitate or promote that act, and since Leonard died as a result of that arson, to find beyond a reasonable doubt that Link was guilty of felony murder. Hence, Link is not entitled to a dismissal of his convictions on Counts 1 and 3. However, pursuant to our conclusion that the District Court abused its discretion in admitting evidence of the Gore Hill fire, we vacate Link's conviction and remand for a new trial. Upon retrial, the Gore Hill fire shall not be admitted as other acts evidence.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

1. **1** Link shared co-power of attorney over Faye with his other sister, Marge Distad.

2. **2** Accordingly, in *Enright*, we distinguished *Paulson* on the ground that, in that case, the State introduced <u>some evidence</u> that the defendant had committed the prior, wrongful acts. Thus, we concluded that "[t]he question in *Paulson* was not whether there was evidence of a prior criminal act by the defendant, but what <u>quantum of proof</u> would be required before that evidence could be admitted." *Enright*, ¶ 24 (emphasis added). Today's decision is distinguishable from the rule of *Paulson* on this same ground, as the State has failed to introduce any evidence of a prior, wrongful act by Link.

However, in a case where there is some, even slight, credible evidence to suggest that a prior wrongful act was likely committed by a certain defendant, the question left unanswered by *Paulson*, *Enright*, and today's decision is what particular "quantum of proof" is required before other acts evidence may be admitted pursuant to the Modified Just Rule. In the past, this Court has implied that other acts evidence must meet a sufficiency of the evidence standard, but we have thus far declined to specify what quantum of proof is sufficient for admittance. For example, we have suggested that the State's "burden of proof as to the [other] acts need not rise to the level required in a criminal prosecution for those acts." *Just*, 184 Mont. at 273, 602 P.2d at 963. However, in the absence of a carefully crafted challenge to *Paulson*, we decline to address the question as to what quantum of proof is sufficient for admitting other acts evidence.